UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| The Bridgeport Guardians, Inc., et al.,<br>*Plaintiffs*,<br><br>*v.*<br><br>Arthur J. Delmonte, et al.,<br>*Defendants*. | Civil No. 5:78cv175 (JBA)<br><br><br><br>March 12, 2009 |

**RULING ON MOTIONS TO INTERVENE**

More than twenty-five years after judgment entered in this case involving race discrimination in the Bridgeport Police Department ("BPD"), several individuals have moved, pursuant to Federal Rule of Procedure 24(a)(2), to intervene and object to an order proposed jointly by the Bridgeport Guardians, Inc. ("Guardians") and the City of Bridgeport ("City"). In their Joint Proposed Order [Doc. # 1743], the Guardians and the City sought an eighteen-month interim modification to the 1983 remedial order, having the objective of achieving sufficiently changed circumstances to justify termination of that order. Before the Court are two motions related to that joint proposal, one brought by eight[1] BPD officers seeking promotion to the rank of detective, and another brought by a civilian intending to apply for an entry-level position within the BPD. In both motions, the putative intervenors (collectively, "Movants") purport to act for themselves and all others similarly situated. The Court held oral argument on the first of these motions on November 4, 2008, during which the Court heard from the Movants, the Guardians, the City, and the Bridgeport Police Union ("Union"), and as the result of which the grounds for intervention became clarified and

---

[1] Eight officers are named in the first motion to intervene. Counsel represented that there was a possibility of a ninth being added, but the Court does not have any record of the list of Movants being subsequently expanded.

refined.

Contemporaneous with this ruling, the Court has also entered an Interim Modification Order [Doc. # 1824] which substantially tracks the Joint Proposed Order. Directing the Movants' concerns to this Interim Modification Order, the question is whether the Movants have asserted an interest in this action—direct, substantial, and legally protectable—which, absent intervention, risks being impaired by the disposition of the action. As explained more fully below, the Court concludes that the Movants have failed to establish a sufficient basis for intervention.

## I.     Relevant Background

In 1982, after a bench trial in this case, Judge Daly held that the Defendants had discriminated against black and Hispanic police officers, in violation of Titles VI and VII of the Civil Rights Act of 1964, by (1) assigning officers to specialized divisions, (2) assigning officers to the various geographical areas of the City, (3) pairing officers, (4) imposing discipline, (5) fostering a hostile work environment, and (6) retaliating against members of the Guardians, all on the basis of race. *Bridgeport Guardians, Inc. v. Delmonte*, 553 F. Supp. 601, 609–18 (D. Conn. 1982). To remedy these violations, Judge Daly issued an order (the "Remedy Order") weeks later which set out new procedures for pairing officers and assigning officers among the specialized and geographic units. *Id.* at 618–19. The Remedy Order also established a rotation system to ensure equal access to the specialized divisions regardless of race, and also confirmed that the City "shall not discriminate on the basis of race in the initiation of disciplinary charges or imposition of penalties" and "shall not subject any police officer to harassment, disciplinary action or different treatment of any kind because of such officer's race." *Id.* at 619. Judge Daly further directed that a special master

2

would be appointed, ordered fees and costs to the Plaintiffs, and noted that the Court would "maintain continuing jurisdiction in this matter to insure complete and continuing compliance with all aspects of this Order."  *Id.* at 619–21.

Leaping ahead a quarter of a century, in July 2008 the City moved pursuant to Rule 60(b) to vacate the Remedy Order [Doc. # 1717] on the ground that changed circumstances render the terms of that order no longer applicable or necessary.  Prompted in part by this motion, the Guardians and the City then engaged in discussions, under the auspices of Magistrate Judge Holly B. Fitzsimmons, which produced a joint proposal addressing the concerns raised by the Rule 60 motion.  After a hearing with all parties to the litigation, the Guardians and the City submitted the Joint Proposed Order.  This revised proposal is the substantive basis for the Court's Interim Modification Order, the impact of which will be reviewed after September 1, 2010 on motion by any party.  Omitting provisions not implicated by the motions to intervene, the Interim Modification Order reads, in relevant part:

1.  *Promotions and Hiring*.  The City shall evaluate all promotional and entry-level hiring examinations to determine whether the examination results and selection procedures evidence a disparate impact on black or other minority candidates.  The City shall take all appropriate and available steps to reduce any disparate impact of examinations or procedures on minority candidates by utilizing race-neutral measures, including the appropriate weighting of the oral and written portions of the examination to reduce the disparate impact while preserving the validity and usefulness of the examination.

2.  *New Recruit Hiring*.  With regard to any entry-level hiring list created by the City between the effective date of this Order and September 1, 2010, the City shall evaluate all entry-level hiring examinations to determine whether the examination results or procedures evidence a disparate impact on minorities.  The City shall attempt to reduce any identified disparate impact on minority candidates by utilizing

3

race-neutral measures, including the appropriate weighting of the oral and written portions of the examination to reduce the disparate impact while preserving the validity and usefulness of the examination. In addition, the City, through the Chief of Police, may, within the Interim Period and notwithstanding any contrary provisions of the Bridgeport City Charter and/or the Civil Service Rules and Regulations, interview candidates to determine their suitability for employment. The City, through the Chief of Police, shall be empowered, notwithstanding the provisions of the Bridgeport City Charter and/or the Civil Service Rules and Regulations, to suspend the "rule of one" in selecting a recruit class from any existing and newly created hiring lists during this Interim Period. The Court will consider at the conclusion of the Interim Period whether a permanent suspension is warranted to eliminate barriers to equal employment opportunity.

3.   *Recruitment.*   The City shall allocate the payments identified in paragraph 10 to a fund to be created and dedicated for the recruitment of minority and female candidates for entry-level positions. These payments may not be used to reduce the Bridgeport Police Department's current expenditures, but shall constitute "new money" for this purpose. The funds shall be expended by the Chief of Police for appropriate recruitment efforts conducted by departmental personnel and/or qualified neutral third parties mutually agreed to by the City and the Guardians.

4.   *Geographic Rotations.*   The Remedy Order provisions mandating geographic rotation of patrol officers are hereby suspended and the Chief of Police shall have discretion to rotate officers throughout the geographic sectors of the City in a race-neutral manner. . . .

9.   *Files of the Special Master.*   Once all complaints remaining pending before the Special Master have been heard and decided, all files related to this case in the possession of the Special Master shall be disposed of in the following way: The City shall review the files and provide to the Court any files related to complaints which resulted in the issuance of a Court Order. The City shall make an electronic copy of all the Special Master files with a corresponding catalogue and provide electronic copies of that information to the Court, the Special Master, the Guardians, the law firm of Koskoff Koskoff & Bieder, the Bridgeport Police Union, and the City. The City shall

preserve its electronic copy for review by the public.  Once these steps have been taken, the City may destroy all case-related paper files in the possession of the Special Master.

10.    *Sanctions.* Of the monetary sanctions currently recommended to be imposed against the City, the City shall allocate $300,000, in six annual installments of $50,000 commencing with FY 2010, towards the recruitment programs described in paragraph 3.  The City may accelerate payments in its discretion if necessary to effectuate the provisions of this Order or to otherwise create changed circumstances before the end of the Interim Period.  If and when changed circumstances warrant the termination of the Remedy Order, the remaining sanctions will not be imposed, subject to the City's satisfactory compliance with this Order.

11.    *Attorney's Fees.* The City shall pay $300,000 in attorney's fees to the Guardians' counsel, Koskoff Koskoff & Bieder, such payment to be made within 90 days of the filing of this Order.  The City and the Guardians represent that this award of attorney's fees corresponds to only a fraction of the uncompensated hours worked by the Guardians' counsel over twenty-five years in the enforcement and implementation of the Remedy Order.  At the request of the Mayor of Bridgeport, Koskoff Koskoff & Bieder has agreed to forgo seeking over $1 million in additional fees for which the City of Bridgeport might otherwise be responsible.

12.    *Relevance of this Order to Union Negotiations.*  Nothing in this Order shall be used to the advantage or disadvantage of any party in collective bargaining negotiations or interest arbitrations occurring during or after the Interim Period.  This Order, related proceedings, and any changes to the operation of the Bridgeport Police Department required to comply with this Order shall be inadmissible in such negotiations and arbitrations.  The status quo for the purposes of any interest arbitration that occurs during the Interim Period shall be as it existed prior to the entry of this Order.  This Order also shall not have any applicability to implementation of final court orders in the case of *Burke v. Bridgeport Civil Service Commission.*

13.    *Interim Period.*  At the conclusion of the interim period on September 1, 2010, the parties may move the Court to vacate the

Remedy Order and that motion will be decided based upon a review of the results of the City's compliance with this Order and a review of changed circumstances since the 1983 Remedy Order that may justify the vacating of that Remedy Order consistent with applicable federal law.

(Interim Modification Order ¶¶ 1–4, 9–13.)

The Movants object to the terms of this Order.  In the first motion to intervene, several "white and non-black" male officers in the BPD argue, on information and belief, that the terms of the Interim Modification Order will affect them in several ways, including by (1) allowing the City "to adopt race-conscious promotional and hiring practices," (2) ignoring "civil service rules and regulations requiring race-blind and strictly merit-based promotional and other selection procedures," (3) altering the scoring of civil-service examinations based on candidates' race or ethnicity in violation of Title VII of the Civil Rights Act of 1964 and the Fourteenth Amendment, (4) changing the race-neutral review process for promotion within the BPD, (5) allocating public money to a fund which would improperly advance the interests of minority BPD employees at the expense of while male employees, and (6) generally expanding the scope of the Remedy Order.  (1st Mot. Intervene [Doc. # 1750] at 2–4.)  The Movants further contend that the Interim Modification Order would unfairly benefit "individuals who are not and never have been 'victims' of anything, much less the actions and omissions of city officials complained of by the plaintiffs in this case, and who have no connection to this case or its original claims."  (*Id.* at 6.)  According to the moving papers, these Movants are primarily concerned with the City's handling of a promotional examination for the rank of detective that they took in 2006.  (Heanue Aff. [Doc. # 1772] at ¶¶ 3–14.)  This dispute was itself the subject of a separate action in state court, *Burke v. Bridgeport Civil Service Commission*, No. CV07402194S, 2008 WL 1735584,

6

at *6 (Conn. Super. Ct. Mar. 31, 2008).

After the Court held oral argument on this first motion, a second motion to intervene was filed on November 14, 2008, on behalf of Kurt Hoben, "a white male who intends to seek hire as a police officer in the City of Bridgeport and compete in the next civil service examination process administered by the City for that purpose." (2d Mot. Intervene [Doc. # 1785] at 1.)  This motion repeated many of the same arguments as the first, including that the Interim Modification Order (1) "will constitute an unwarranted and impermissible expansion of the longstanding remedial order to matters unrelated to this case," (2) "would constitute an abuse of this court's authority for the impermissible purpose of authorizing preferential treatment of blacks and women in the hiring process," (3) "will violate the movant's and other similarly situated applicants' rights under 42 U.S.C. § 2000e-2(a)(1)," (4) "will permit the city to engage in outright racial balancing in violation of 42 U.S.C. § 2000e-2(j)," (5) "would permit the city to alter, or engage in acts that have the effect of altering[,] the results of employment-related tests for reasons of race in violation of 42 U.S.C. § 2000e-2(*l*)," and (6) "would require the city to allocate a substantial sum of public money to the establishment of a fund to be dedicated to providing employment-related benefits and privileges to, and otherwise advancing the interests of, blacks and women in the hiring process" at the cost of excluding white males.  (Mem. in Supp. [Doc. # 1786] at 10–11.)  Citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), Hoben claims that he has been injured by being unable to "compete on an equal footing" in the application process, and asserts his "right to insist that he undergo a fair and lawful selection process." (*Id.* at 15–17.)

The Court will address the interests and objections asserted in these two motions in

turn, taken together where appropriate.

## II.     Intervention Under Rule 24(a)(2)

Movants seek to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2), which grants a right of intervention to anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  By the Second Circuit's reading, "[t]o intervene as of right, a movant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action."  *Brennan v. New York City Bd. of Educ.*, 260 F.3d 123, 128–29 (2d Cir. 2001).  The first factor listed, timeliness, is not an issue in this case.

The type of interest necessary to support intervention under Rule 24(a)(2) is one which is "direct, substantial, and legally protectable."  *Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990).  "An interest that is remote from the subject matter of the proceeding, or that is contingent upon the occurrence of a sequence of events before it becomes colorable, will not satisfy the rule."  *Id.*  "[E]xcept for allegations frivolous on their face, an application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention."  *Oneida Indian Nation v. New York*, 732 F.2d 261, 265 (2d Cir. 1984).  In *Brennan*, another case involving a settlement agreement of race-discrimination claims, the Second Circuit found that the movants had raised a sufficient interest in the proceedings because their claims were identical to those raised by other parties.  260 F.3d at

130–31.  The kind of interest asserted by the movants—loss of seniority rights—was held to be cognizable even though somewhat speculative because "the loss of appellants' relative seniority . . . [was] central, rather than collateral, to the [settlement agreement]." *Id.* at 132. Courts have granted motions to intervene in institutional-reform cases, even at advanced stages of the proceedings, so long as the interests asserted are sufficiently concrete and related to the underlying action.  *See, e.g.*, *Cotter v. Mass. Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31, 34–35 (1st Cir. 2000) (concluding, in a constitutional challenge by white officers to police promotional practices, that black officers' "interest in defending [their] own promotion[s]" at issue in the case was sufficient); *Jansen v. City of Cincinnati*, 904 F.2d 336, 342 (6th Cir. 1990) (finding that intervenors, black firefighter applicants and parties to a consent decree, had a cognizable "interest in continuing affirmative action under the consent decree"); *United States v. City of Chicago*, 870 F.2d 1256, 1260–63 (7th Cir. 1989) (permitting intervention by police officers whose promotions, otherwise mandated by state law, were impeded by the city's alteration of test scores).

A party may be justified in intervening to protect an interest if proceedings in the case, absent the participation of the intervenor, will "operate to bar under the doctrines of *res judicata* or collateral estoppel any future attempts by [the intervenor] to pursue those concerns.  *Washington Elec. Coop.*, 922 F.2d at 98.  But where there are no external or structural barriers to protecting an interest in a separate action, intervention as of right is not warranted.  For example, in *S.E.C. v. Everest Management Corp.*, 475 F.2d 1236, 1239 (2d Cir. 1975), the Second Circuit reasoned that, because the putative intervenors would not be precluded from bringing a separate action seeking money damages for securities fraud, their burden of duplicating the litigation efforts of the SEC "is not the sort of adverse practical

effect contemplated by Rule 24(a)(2)." *See also Public Serv. Co. v. Patch*, 136 F.3d 197, 207 (1st Cir. 1998) (denying intervention based on absence of any impediment to appellants' "right to participate in ongoing or future administrative proceedings").

Finally, an intervenor must show that "there will be inadequate representation of its rights unless it is allowed to intervene." *Washington Elec. Coop.*, 922 F.2d at 98. This is not typically a heavy burden, however, and this last requirement requires only a showing that an intervenor's interests are not perfectly congruent with those of existing parties. *Brennan*, 260 F.3d at 132–33.

**III.   Discussion**

Turning to the interests asserted, the Court will examine each in light of this governing legal framework.

**A.   Detective Promotions**

The Movants' claim in the first motion to intervene is that they have an interest in being promoted to the rank of detective in accordance with the City's civil-service process and with the examination they have already taken. This interest, they argue, will be impaired if the City departs from the "rule of one" or favors minority applicants in promoting officers to detective. Because the Movants read the Interim Modification Order as allowing or even compelling such approaches, they seek intervention in order to protect their promotional rights.

The Movants' written submissions are centrally concerned with this issue (*see* Heanue Aff.; Exs. 1–7), and the parties and the Court spent considerable time discussing the matter at oral argument. But the City offered a critical representation about the effect of the Interim Modification Order on the detective promotions (litigated separately in the *Burke*

10

case) which was then confirmed by counsel for the Guardians and for the Union:

> The Court:  Let's get a clarification on this point right here and now then. Let me hear from the city with respect to the applicability of any of the procedures or processes put in place by the proposed order to the detective list, whatever it is and however it ends up after all legal processes are finished.
>
> Mr. Laske:  There is no application to the *Burke* process of any of the orders in this court.
>
> The Court:  Okay.  The problem of the "*Burke* process" is that *Burke* doesn't have to do with the viability of the list, it has to do with the bargaining ability of the weighting.  But my question to you is, is the city taking the position that this proposed order will not affect whatever is the hiring from whatever is the extant list for detectives?
>
> Mr. Laske:  Yes. . . .
>
> The Court:  So there is no application of this order to the extant . . . 2006 detective list.
>
> Mr. Laske:  That is correct.
>
> The Court:  And the parties have no objection to my adding that as a clarification of the proposed order?
>
> Mr. Laske:  No, your Honor.
>
> The Court:  Okay.
>
> Ms. Torre:  I didn't hear from the Guardians.
>
> Mr. Ponvert:  I have no objection to that. . . .
>
> The Court:  Mr. Elliott, I take it you don't have any objection.
>
> Mr. Elliott:  I don't . . . .

(Oral Argument Tr. 108:4–109:19, Nov. 4, 2008.)

The Movants' interest related to the process for being promoted to detective thus falls

away.  With the parties' agreement that the detective list will not be affected by the Interim Modification Order or anything else in this case, there is no basis for granting the Movants a right to intervene to protect this interest.

### B.        Desire to Apply

In the second motion to intervene, Hoben claims an interest in applying to the BPD under a process which is fair and non-discriminatory.  The Guardians and the City argue that this interest is insufficient under Rule 24(a)(2) because (1) "Hoben has no more particularized [an] interest than a vast, unidentified, and fungible class of people" and (2) "it is impossible to know whether his own personal rights and interests will ever be violated in the way he claims they are threatened."  (City's Obj. [Doc. # 1805] at 5.)

In *Adarand Constructors*, the Supreme Court found that the petitioner could challenge a statutory and regulatory framework granting preferential treatment to minority-controlled small businesses based on a showing that competing on an unfair contractor-bidding framework would cause imminent future harm.  515 U.S. at 211–12.  The Court reasoned:

> Because the evidence in this case indicates that the [government agency] is likely to let contracts involving guardrail work that contain a subcontractor compensation clause at least once per year in Colorado, that Adarand is very likely to bid on each such contract, and that Adarand often must compete for such contracts against small disadvantaged businesses, we are satisfied that Adarand has standing to bring this lawsuit.

*Id.* at 212.  Animating this conclusion, however, was the fact that the complex legal framework under which bidders compete was undisputed and clearly set out in federal statutes and regulations.  The D.C. Circuit emphasized this point in a case involving a white male's challenge to a governmental affirmative-action policy, *Worth v. Jackson*, 451 F.3d 854,

855, 860 (D.C. Cir. 2006).  Citing *Adarand Constructors* and earlier cases, the panel noted

that standing doctrine allows for certain types of speculative injuries where, in the context

of set-aside programs, "the 'injury in fact' is the inability to compete on an equal footing in

the bidding process, not the loss of a contract."  *Id.* at 859.  Although "tak[ing] seriously" the

plaintiff's statement that he would apply for a job covered by the challenged policy in the

near future, the court based its conclusion that he nevertheless lacked standing on a critical

difference:

> Worth challenges no statute, regulation, or written policy committing HUD
> to favoring minorities or women, resting his claim instead on speculation,
> untethered to any written directive, about how HUD is likely to make future
> employment decisions. . . . For that reason—and in contrast to the
> contractors in *Northeastern Florida* and *Adarand*, both of which faced
> almost-certain application of race-conscious statutes—Worth may never
> have to compete at a disadvantage for a new position. . . .
>
> [I]n a facial challenge to a *de facto* policy, a court attempting to establish its
> jurisdiction has no way of satisfying itself that the alleged injury will ever
> actually occur.  Perhaps the agency will abandon its race-conscious ways, or
> perhaps, having never committed to any general policy, it won't discriminate
> against that plaintiff.  Whatever the agency chooses to do, there exists a
> healthy chance that it will never harm the plaintiff.

*Id.* at 860.

Although this analysis focuses on constitutional standing, the issue of whether the

claimed future harm was speculative or imminent applies with equal force to the principles

underlying Rule 24(a)(2).[2]  If there is no way to know with reasonable certainty that Hoben

will be harmed by a discriminatory policy, then there is no justification for permitting him

to intervene in this case to protect that speculative interest now, when nothing prevents him

---

[2] The Court addresses Article III standing as it applies to Movants' asserted interests
in Part III-F, below.

from waiting until experiencing the harm to file suit.  Unlike in *Adarand Constructors*, the discriminatory policies Hoben purports to challenge are not yet in place.  Rather than point to a definite set of regulations that are already in effect, Hoben can only argue that the City *may* violate the Equal Protection Clause or Title VII when it proceeds with hiring new police recruits in accordance with the terms of the Interim Modification Order.  Such speculation betrays the insufficiency of this ground for intervention under Rule 24(a)(2).

### C.   Safety

Throughout oral argument, the Movants argued that the Interim Modification Order would have the effect of lowering the City's hiring standards for the BPD, thereby putting officers at risk of working in a dangerous environment with less-than-qualified co-workers. As counsel explained in colloquy with the Court:

| | |
|---|---|
| Ms. Torre: | . . . Unlike the job that everyone else in this room has, which does not involve risking our lives and safety for anybody, the job of a police officer is extremely dangerous, and whether one is a detective or sergeant or lieutenant or line officer, it is the case, as we've seen most recently in New Haven, . . . officers are at risk more than the average Joe of being killed on the job.  And having spoken with the movants, they are deeply concerned about the increased risk to their safety, indeed, their lives. |
| The Court: | And why do you think that interest is not adequately represented by the chief of the Bridgeport Police Department?  Is that not a concern that is paramount in the city and the chief's purview as opposed to the distinction that you've made between the union and the interven[o]rs? |
| Ms. Torre: | Well, not when the city, and by extension its chief, are in a federal court in writing stipulating that officers at the entry level can now be hired not on the basis of relative merit, but on the basis of race. |

(Tr. 17:13–18:10.)  Later, counsel elaborated on the basis for concern over officer safety:

Ms. Torre:    I've identified it as a safety issue because, as I understand it, the proposed order will allow the City of Bridgeport to forego hiring a highly credentialed candidate who may have a B.S. degree in law enforcement and experience in municipal police departments or state trooper experience, and who has a host of other attractive credentials, . . . in favor of someone who scored 70 on the list and is the least qualified person.

The Court:    And how does their interest, these eight people, maybe nine, differ from the interests of everyone else in the department in terms of safety? . . .

Ms. Torre:    Well, as I said in my moving papers, the officers consider themselves to be representing in their efforts to intervene the interests of all others similarly situated.  The Guardians have an interest in increasing the ranks of their organization and their numbers in the department, I understand that, and if the Guardians don't care about safety, then that's their problem, but my clients have a right to raise the issue.

. . . We have an interest in not permitting that to happen if it will result, as it already has, your Honor, in officers, or at least one or two, who are illiterate and who stand at a change of shift and have to pretend to read a document upside down because they don't want to make it evident that they can't read.

(Tr. 21:12–22:11, 23:23–24:4.)

Plaintiffs vigorously dispute that the Interim Modification Order implicates any safety issues for the Movants or any other BPD personnel, and further urge that any issue of safety is amply represented by the Guardians, the City, and the Union.  (Tr. 53:7–17.)  On this point, the Union argues that it lacks standing under state law with respect to new recruits.  But that does not mean that between the Guardians (and its members), the City (including the BPD), and the Union (to the extent it represents current officers), the issue

of police safety is not adequately represented in the case.

An argument that the actors in this case are not sufficiently concerned with the safety of BPD officers is extraordinarily difficult given the factual record, and the Movants have not cleared that significant hurdle so as to justify intervention.  Plus, rather than mandate the hiring of unqualified recruits unable to protect their fellow officers, the Interim Modification Order merely sets out certain procedures which the Movants claim will have the prospective effect of producing an unsafe police force.  Should they have a basis for believing that the composition of their workforce is dangerous, the Movants have pointed to nothing impeding their ability to bring such a challenge in the future.  For all these reasons, the risk to officer safety is too speculative to justify intervention on this record.

### D.    Future Promotions

In addition to their arguments regarding the detective examination and the process for hiring new recruits, the Movants also object to the language in the Interim Modification Order which might impact their *future* promotional opportunities.  According to Movants' counsel:

> Ms. Torre:    [O]n the issue of promotions, your honor, it's not just the existing list, they are asserting a right to be considered for promotions to other positions, to higher ranks without regard to the race of the candidates, and they are asserting an absolutely cognizable interest in that regard if in fact they're going to be denied a position because the city ignores the rule of one or takes action after the fact to alter the results of a civil service exam because of the race of the candidates.

> The Court:    And why is that not speculative at this point?

> Ms. Torre:    It's not speculative, your Honor.  The order says . . . that the city shall examine all civil service examination results.  And based on the demographics of those results, the city is given

16

> a license to change the results for reasons of race, for reasons
> of achieving racial balance, and need I remind the Court that
> Title VII explicitly prohibits that.

(Tr. 40:9–41:5.) The Movants' contention is that their interest in future promotion is at risk based on the possibility that the City will unlawfully adjust examination weighting and results on the basis of race. Movants' position is that an "inten[t] to eliminate adverse impact" is itself "a race-conscious employment practice." (Movants' Reply [Doc. # 1773] at 5.)

However, here and elsewhere in their presentation, the Movants conflate permissible adjusting of civil-service hiring procedures with impermissible race norming which violates § 106 of the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1075. That provision, which amended § 703 of Title VII and is codified at 42 U.S.C. § 2000e-2(*l*), makes it unlawful for employers "to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin." Contrary to the interpretation urged by the Movants and the Union, § 106 was "intended to prohibit 'race norming' and other methods of using *different* cut-offs for different races or altering scores based on race." *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999). Based on the clear statutory language, the *Hayden* panel had little difficulty concluding that the use of a promotional examination which is "scored in the same manner for all applicants" and with no "differential cutoffs" does not violate § 106. *Id.* This critical distinction is consistent with the Second Circuit's longstanding view that "voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination." *Kirkland v. New York State Dep't of Corr. Servs.*, 711 F.2d 1117, 1128 (2d Cir. 1983).

The cases Movants cite in support of applying § 106 to this case are unavailing.  In *Biondo v. City of Chicago*, 382 F.3d 680, 682–84 (7th Cir. 2004), the Seventh Circuit held unlawful an approach to curing disparate impact whereby the city used separate promotional lists according to race.  Section 106, the panel explained, forbids such a "dualist response to disparate impact."  *Id.* at 684.  Conceding that there is no direct comparison to the record in this case, the Movants also cite *Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006), for the proposition that "any actions by a public employer in respect to the results of a test which have the effect of changing the results violates [§ 106]."  (Tr. 43:13–19.)  But that is not what *Dean* held.  In *Dean*, the city's process for hiring firefighters used a consistent initial examination requirement but, for applicants meeting the minimum score, then "separate[d] applicants' exam scores by race and sex and select[ed] the same number of blacks and whites to proceed, starting with the highest exam score on each segregated list."  438 F.3d at 463.  "This method of selection between phase one and phase two," the panel concluded, "violates the plain language of section 2000e-2(*l*) because it has the practical effect of requiring different cutoff scores, based solely on race and sex, for continuing further in the hiring process."  *Id.*

Neither *Biondo* nor *Dean* can be usefully be applied to the context of this case. Naturally, if the City did engage in race norming by weighting or evaluating BPD applicants differently according to their race, that could be unlawful under § 106.  But the Interim Modification Order neither requires nor condones such differential treatment, and such future implementation of new hiring practices is speculative and contingent in any event.  Thus, this claimed interest relating to future promotional opportunities cannot support intervention under Rule 24(a)(2).

### E.        Other Interests

The Movants also claim an interest in having the records of the Special Master preserved for future use in litigation.  As counsel explained at oral argument:

| | |
|---|---|
| Ms. Torre: | . . . [T]he movants do have an interest in making sure that no documents generated by Mr. Clendenen in the course of his presiding over evidentiary hearings on the complaint of any Bridgeport officer are in any way disposed of or destroyed. |
| The Court: | What is their interest? |
| Ms. Torre: | We anticipate future litigation against the City of Bridgeport in which—or in connection with which the record of Mr. Clendenen's many years of hearings may be, at least I determine to be, relevant. |
| The Court: | And you anticipate litigation on what, for what claims? |
| Ms. Torre: | Well, who can say, but— |
| The Court: | Well, isn't that what the problem is, that it's speculative[?] |
| Ms. Torre: | . . . With the files I can't tell you what claims may come. |

(Tr. 14:12–15:7.)  By its own terms, this interest is too speculative to justify intervention as of right.  Moreover, counsel for the Movants conceded this interest on the ground that the Special Master's records will be fully preserved in electronic form and made available for public review.  (*Id.* at 16:8–25.)

The Movants also object to paragraphs 3 and 10 of the Interim Modification Order insofar as they create a public fund for the recruitment of minority officers at the expense of non-minority applicants.  When asked at oral argument how this creates a direct, substantial, and legally protectable interest, counsel responded:

| | |
|---|---|
| Ms. Torre: | Along the same lines of what I've already laid out with respect to their interest in entry level hiring.  The money is to be |

19

dedicated to the hiring of people on the basis of their race, and now remarkably their gender, although gender has nothing to do and never has had anything to do with this case.

So, apart from struggling to find a basis on which we can just, you know, lodge a legitimate complaint about this Court going to places where it has no business going and furthering an agenda that has no relationship to this case or its adjudicated claims, the fact is that I do see a tie between the Court ordering the city to use funds for the very purpose of recruiting people on the basis of their race and gender. It is intimately tied to the commitment the parties have made to begin hiring on that basis, not on the basis of how you score on an exam.

The Court:    So it's the safety interest.

Ms. Torre:    It's the safety interest.

(Tr. 26:22–27:25.) So clarified, because the Court has already concluded that the "safety interest" is an insufficient ground for intervention, this fails as well.

In paragraph 11, the Interim Modification Order details how the parties have agreed to handle the long-deferred issue of attorney's fees to Plaintiffs' counsel. Movants object to this as follows:

Ms. Torre:    . . . The money issue as it relates to the creative means by which I believe $300,000 are to be transferred to the Guardians, I stated my position in my moving papers. . . . This is public money. It is to be, granted by creative means, turned over to the Guardians or their law firm with an explicitly dedicated use, for the benefit of black officers in the department, for the benefit of promotional candidates of a certain race.

The Court:    I'm sorry, you are referring to the attorney's fees?

Ms. Torre:    I'm referring to the $300,000 that I believe is not being characterized as attorneys' fees. . . . But I don't buy it, not

20

> based on what I saw in that transcript of August 6, 2008, your honor. . . .

The Court:    So you read the transcript and you understand that monies paid as attorneys' fees to the law firm representing the Guardians over these years is being proposed to be paid as attorneys' fees with Mr. Ponvert saying "we can do what we want with those fees."

Ms. Torre:    That's not how I read it at all. . . .  It strikes me as money laundering, your Honor.  That's the only way I can put it.

(Tr. 30:25–33:18.)  Despite their vivid characterizations of the terms of this fee award, Movants have not explained how they have a sufficient interest in the money as contemplated by Rule 24(a)(2).

The Movants also reference paragraph 4 in the Interim Modification Order dealing with geographical rotations, but then concede that this interest is adequately represented by existing parties:

The Court:    . . . [L]et's move on to geographic rotations.  You said that the rotations in all forms was not a part—was not an issue in which the interven[o]rs had an interest, a cognizable interest, for the purpose of their motion.  That includes also the specialized units? . . .

Ms. Torre:    . . . [T]hey do have an interest in both seniority rights and their right not to be forced into an assignment because of the color of their skin.  However, I see that interest as being raised by the union in this case.

(Tr. 28:2–16.)  The Movants further clarify that they claim no interest related to the procedure for processing complaints, the position of assistant chief, and the non-discrimination policy. (Tr. 33:21–34:12.) These interests, then, will not support intervention as of right.

### F.      Remaining Issues

As each of the asserted interests falls away, the Movants are left with what is essentially a policy objection to the City's approach to remedying longstanding departmental racial discrimination.  The existence of such discrimination is demonstrated by the widening statistical gap between the racial demographics of the City and the representation of African Americans and other minorities in the BPD, particularly in supervisory positions and specialized units.  Movants contend that they have a right not to work under race-conscious employment policies, and they object to any efforts by the parties or the Court to take account of the status of race in deciding when and how to finally bring this case to a close.

The Movants are correct, of course, that the question of whether they have a cognizable interest cannot be conflated with the ultimate merits of their objections.  *See Brennan*, 260 F.3d at 129–30 ("An interest that is otherwise sufficient under Rule 24(a)(2) does not become insufficient because the court deems the claim to be legally or factually weak.").  But an interest affording a right of intervention cannot be based on a misreading of the record or the governing law.  Unlike the employees concerned about impairment of their seniority rights in *Brennan*, the Movants here—with the detective and new-applicant interests conceded to be out of the picture—are in effect claiming nothing more than a generalized interest in seeing the City and BPD comply with their non-discrimination obligations under federal law.  Were that to be sufficient, all BPD employees—and perhaps all individuals affected by the BPD's actions carrying out its obligations in the Interim Modification Order—would be proper intervenors, a conclusion difficult to square with Rule 24(a)(2)'s requirement that the interest supporting intervention be direct and substantial, not collateral and contingent.

Moreover, the Movants admit that the Interim Modification Order will not impair these remaining speculative interests in the future:

> Ms. Torre: . . . I anticipate that if the city continues to engage in the sort of conduct which led to the *Burke* litigation, that [the] city is going to be embroiled in litigation for years to come, all having to do with race-based policies and practices in that department. Toward that end—
>
> The Court: And you recognize there is nothing in the joint proposed order that in any way precludes or impacts any future litigation in that regard.
>
> Ms. Torre: I understand that.

(Tr. 15:13–23.) Having failed to demonstrate that there is an external or structural barrier which impairs their ability to seek redress for these policy complaints in future proceedings, the Movants have not met their burden under Rule 24(a)(2).

Finally, there is the matter of Movants' standing. Pursuant to Rule 24(c), a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." If permitted to intervene as of right, the Movants would file a pleading in accordance with Rule 7(a) asserting their legal claims. It follows, then, that the Movants must have constitutional standing in order to assert those claims in federal court. *E.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731–32 (D.C. Cir. 2003) (holding that an intervenor must have Article III standing in addition to satisfying the requirements of Rule 24(a)(2)). There is some uncertainty, however, as to the Second Circuit's position on the relationship between intervention under Rule 24(a) and standing under Article III, *see Brennan*, 260 F.3d at 131 (noting that "where a proposed intervenor's interests are otherwise unrepresented in an action, the standard for intervention is no more burdensome than the standing requirement"); *United States Postal Serv. v. Brennan*, 579 F.2d 188, 190 (2d Cir.

1978) ("The existence of a case or controversy having been established as between the Postal Service and the Brennans, there was no need to impose the standing requirement upon the proposed intervenor."), and indeed the conflict between circuits on this issue is a "well-known one," *Mangual v. Rotger-Sabat*, 317 F.3d 45, 61 (1st Cir. 2003); *Diamond v. Charles*, 476 U.S. 54, 69 n.21 (1986) (collecting cases from the Courts of Appeals).

Nevertheless, viewing the Movants' claims through the lens of justiciability, it becomes even clearer that their asserted interests are not appropriate to be adjudicated in this case. Because the Movants have not attached a pleading as required by Rule 24(c), the precise nature of their claims is not yet apparent. Further, the Court is not convinced either that the Movants have met the requirements for constitutional standing or that their claims are ripe. Standing requires a showing of a concrete and imminent injury, traceable to the challenged conduct, and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The ripeness doctrine, in turn, prevents the courts from adjudicating matters which "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted). All of the Movants' asserted interests are speculative and conjectural, for the City has yet to take any action in response to the Interim Modification Order. And for the same reason, the hypothetical claims are unripe and premature. These justiciability flaws, applicable to the entirety of the asserted grounds for intervention, amount to additional, independent reasons to deny the motions to intervene.

24

**IV.**      **Conclusion**

For all these reasons, the Court concludes that the Movants have not provided a sufficient basis to justify intervention at this time on the record as it stands in this decades-old case.  Accordingly, the motions to intervene [Doc. # 1750, 1785] are denied.


IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 12th day of March, 2009.