UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| The Bridgeport Guardians, Inc., et al., | Civil No. 5:78cv175 (JBA) |
| *Plaintiffs*, | |
| v. | |
| Arthur J. Delmonte, et al., | December 29, 2010 |
| *Defendants*. | |

RULING ON DANIEL GARCIA'S CLAIMS OF RACIAL DISCRIMINATION BY THE BRIDGEPORT POLICE DEPARTMENT [Doc. # 1974]

On October 4, 2010, the Court issued an Order [Doc. # 1970] directing Albert Karpus, Daniel Garcia, Gilberto Valentin, Juan P. Gonzalez, JoeAnn Meekins, Murphy Pierce, and William Bailey, who had complaints pending with the Special Master, to submit to the Court "[a] brief statement of the conduct that the officer claims constitutes racial discrimination against him or her by the Bridgeport Police Department, . . . [a] memorandum presenting the officer's argument in support of his or her claim of racial discrimination, . . . [a]ny and all documents, affidavits or other evidence that the officer claims support his or her claims of racial discrimination [and] . . . [a]ny request to present oral testimony from the officer or any witnesses, describing briefly the substance of the proposed oral testimony."

Officer Daniel Garcia, through his attorney, timely filed a "statement of conduct" by the Bridgeport Police Department ("BPD") that he claims constitutes racial discrimination against him "in the terms and conditions of his employment, and . . . in ongoing and continuous different treatment with respect to retraining; discipline, and . . . a hostile work environment," which led to "his being forced out of the exclusive Tactical Narcotics Team (TNT) unit." (Garcia Stmt. [Doc. # 1974] at 1–2.) A hearing on his claims was held October

19, 2010. For the reasons discussed below, Officer Garcia's claims of racial discrimination are dismissed.

I.     Officer Garcia's Complaint and Relevant Factual Background

Officer Garcia puts forth four specific (and often interrelated) claims of discrimination: (1) he was forced out of the TNT unit; (2) Lieutenant LaMaine ordered him to retraining, which was not the practice of the BPD for similarly situated white officers including Officer Barbara Gonzalez (white female); (3) he was thereafter suspended for refusing to follow "what he reasonably believed to be an unethical and illegal order" to attend retraining; and (4) he "was subjected to a hostile work environment supported by LaMaine; Deputy Chief Radzimirski; Officer Barbara Gonzalez (white female) and others within the department." (*Id.* at 2.)

Garcia alleges that Lieutenant LaMaine ordered him to attend retraining, and imposed a two–day suspension without pay, in response to an August 15, 2006 automobile accident in which Garcia accidentally struck LaMaine with his patrol car, fracturing LaMaine's knee. (*Id.* at 5–6.) Garcia claims that Officer Gonzalez, who hit a suspect with her patrol car during the same incident, received no discipline. (*Id.* at 6–7.) According to Garcia this "raises an inference of discrimination." (*Id.*) However, the supporting documentation of record and Garcia's testimony at the hearing make clear that Garcia was not subjected to retraining and suspension because of the August 15, 2006 patrol car incident, but instead was ordered to retraining following his second motor vehicle incident on April 30, 2007 in which Lieutenant LaMaine believed that Officer Garcia had "cut off" LaMaine with his patrol car as LaMaine pursued a suspect on foot. (*See* Ex. 3 to Garcia. Stmt. at 4; Ex. 5 to Garcia Stmt. at 3.) When Garcia refused to attend the ordered retraining,

the BPD penalized him with a loss of two holidays. (*See* Ex. 3 to Garcia Stmt. at 4–7; Ex. 5 to Garcia Stmt. at 3.) The disciplinary action against Garcia was, according to BPD Chief Bryan Norwood, the result of Garcia's violation of three Department Rules and Regulations: (1) Rule 1.1 requiring that department members familiarize themselves with and abide by the rules; (2) Rule 1.3 requiring department members to "obey all Rules and Regulations, orders, instructions or requirements"; and (3) Rule 4.2 which provides for discharge, demotion, suspension, or other penalty for failure to "perform the duties of . . . rank or assignment." (Ex. 4 to Garcia Stmt.) Garcia does not claim that Officer Gonzalez was involved in a second traffic incident or that she was similarly accused of insubordination or violations of the above rules.

Garcia proffers the BPD Parity Reports from July 5, 2007 and May 29, 2007, which he claims demonstrate "significant disparities in discipline based on the race of the individuals being disciplined within the BPD." (Garcia Stmt. at 7.) According to Garcia, "[n]o Bridgeport Police Officer cited on this Parity Report, was disciplined as harshly as Daniel Garcia." He is the only officer who received three forms of discipline: the loss of two holidays, retraining, and transfer from TNT. Despite the Report's classification of this transfer as "voluntary", Garcia claims that his commanding officers constructively transferred him out of the unit through their conduct and orders. (*Id.* at 7–8.)

A review of the Parity Reports shows, however, that all of the offenses listed for officers other than Garcia concern motor vehicle–related violations, whereas Garcia's listed offense is described as "officer refused direct order to attend training." (Ex. 3 to Garcia Stmt.) In addition, Garcia is the only officer listed in the Parity Reports as violating Rule 4.2: "failure to perform duties of rank/assignment." (*Id.*) At the October 19, 2010 hearing,

Garcia testified that he was unaware of any white officers who had refused retraining and were not disciplined.

Officer Garcia claims that these allegedly discriminatory discipline–related actions by the BPD contributed to a racially hostile work environment, as did several other incidents over the course of his employment. (Garcia Stmt. at 9–10.) He includes among these incidents several encounters with Officer Gonzalez (the white comparator discussed above). (*Id.* at 10.) According to Garcia, he reported Gonzalez "for swearing at him, telling [Garcia] to 'suck my dick,' referring to [Garcia] in demeaning and derogatory terms, including referring to Mr. Garcia in offensive Spanish terms, including referring to him as a 'cabron.'" (*Id.*; Ex. 1 to Garcia Stmt. ¶ 11.) Deputy Chief Radzimirski responded to Garcia's report only by telling Garcia "to 'just get along,'" after which Garcia claims Gonzalez continued to refer to him "in derogatory and profane terms in Spanish," which went unaddressed by Radzimirski. (Garcia Stmt. at 10.) Garcia clarified at the hearing that what had actually transpired with respect to the derogatory language was that he had overheard Officer Gonzalez refer to Hispanic detainees as "Banderos" and "Cabrones," and after Garcia confronted her about her use of this language she told him to "suck my dick." After Radzimirski's instruction to "just get along" had no effect on Gonzalez and his supervisors took no further action, Garcia concluded that he was being treated less favorably than Officer Gonzalez.

Officer Garcia filed a CHRO Complaint Affidavit on June 27, 2007 and a complaint at the BPD Office of Internal Affairs on September 11, 2007, following which he claims "adverse employment actions against [him] escalated, and the terms and conditions of [his] employment were irreparably altered," and Radzimirski and LaMaine frequently

4

"intimidated and bullied" him. (*Id.*) Garcia also references a prior incident in 2005, when a female suspect escaped custody on his watch, after which Garcia found "pictures of a doll with silver masking tape across his mouth, with comments at the bottom of the photographs" such as "Danny Garcia bound and gagged by Doris Kenlario" and "Danny sitting, waiting for the troops to save him." (*Id.* at 10–11.) Garcia claims that Radzimirski placed one of the photos near Garcia's face "and, while laughing, said, yeah, it does look like you." (*Id.* at 11.) Garcia asked Radzimirski "if he was condoning this, and he [Radzimirski] just went to his office and closed the door." (*Id.*) At the hearing, Garcia opined that Radzimirski would not do something like this to a white officer, and that following the escape, no officers similarly mocked Bobby Simpson, who is white and had been responsible for cuffing the female suspect–escapee. Garcia viewed the disparity in Radzimirski's treatment of Simpson, as compared with him, as a racially–motivated reprimand.

Officer Garcia also claims that Lieutenant LaMaine, in addition to ordering retraining, "would scream at Garcia in front of others, and claim that he wasn't going to let him hit him again with the vehicle, and then attribute this rude and offensive conduct to 'flashbacks' to the accident when Garcia hit him with the cruiser." (*Id.*) Garcia claims to have been involuntarily transferred out of TNT based on LaMaine's recommendation to Radzimirski that Garcia "should be removed from TNT," and Radzimirski's recommendation to Chief Norwood that "Officer Garcia be suspended without pay for 5 days, and be removed from TNT." (Ex. 2 to Garcia Stmt. at 28, 30.) Garcia further bases his constructive transfer claim on harassment he received from Gonzalez and Lieutenant LaMaine and the fact that his complaints produced no response. As a result he felt that he could no longer trust his colleagues and thus could not safely remain in the TNT unit.

According to Garcia, Radzimirski's verbal abuse did not cease even after Garcia's departure from the TNT unit, as Radzimirski goaded Garcia about the transfer by asking him "how do you like patrol?" Garcia also claimed at the hearing that he was upset about not being allowed to park his car in a certain BPD lot that other officers, like Gonzalez were allowed to park in. It is unclear from Radzimirski's comment in response to Garcia's desire to park in the lot that "rank has its privileges" what factors the BPD used in granting access to the lot.

II.     Discussion

Officer Garcia claims that the BPD discriminated against him in the terms and conditions of his employment by treating him differently than similarly–situated white officers with respect to retraining and discipline and by creating a racially–hostile work environment. The Court has reviewed the facts and circumstances set out in Officer Garcia's submissions to the Special Master, and subsequently to the Court, to determine whether he has presented evidence sufficient to demonstrate racially discriminatory treatment in violation of the 1983 Remedy Order. *See* October 4 Order; *Bridgeport Guardians v. Delmonte*, 553 F. Supp. 601, 618–20 (D. Conn. 1982).

As to Officer Garcia's claim that he was treated unfavorably as compared to Officer Gonzalez, a white BPD officer, on the basis of his race by being ordered to undergo retraining, Garcia must demonstrate that he and Gonzalez "were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. County of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (internal quotations and citations omitted). It is clear that Lieutenant LaMaine did not order discipline against anyone after the August 15, 2006 car accidents involving both Garcia and Gonzalez, but

6

instead ordered Garcia's retraining after a second patrol car incident on April 30, 2007. (*See* Ex. 3 to Garcia Stmt. at 4; Ex. 5 to Garcia Stmt. at 3.) Absent any second vehicular incident involving Gonzalez, Garcia's evidence fails to show that LaMaine treated Gonzalez more favorably than Garcia after the two engaged in comparable conduct. *See id.* In addition, Garcia's discipline was not solely the result of the April 30, 2007 incident but his refusal to obey LaMaine's order to attend retraining. (Exs. 3–5 to Garcia Stmt.) He cannot show that he was treated differently than similarly–situated white officers because no officer listed in the Parity Reports on which he relies received penalties for insubordination, and thus there is no relevant comparator evidence against which the Court can assess the motivation for Garcia's discipline. (*See* Ex. 3 to Garcia Stmt. at 7–12.)

With respect to the race–based hostile work environment allegations, Garcia described Officer Gonzalez's conduct somewhat inconsistently between his written statements and his hearing testimony, as to whether Gonzalez addressed her offensive and derogatory language in Spanish directly to him or towards Hispanic prisoners in Garcia's presence, which made him feel as if she were directing those words at him. (*See* Ex. 1 to Garcia Stmt. ¶ 11.) The evidence of Gonzalez's Spanish–language insults that Garcia saw as verbal abuse and derision, intemperate or offensive as they may be, presents, at most, "a few isolated incidents of racial enmity." *Aulicino v. Dep't of Homeless Servs.*, 580 F.3d 73, 83 (2d Cir. 2009). Although Officer Carlos Negron testified during an OIA interview that Officer Gonzalez had previously called him "a cabron and a pendejo," he added that it did not upset him (Ex. 5 to Garcia Stmt. at 9), and this additional example of Gonzalez's contemptuous vocabulary fails to prove widespread use of offensive and racially–motivated language directed at Hispanic officers and violative of the Remedy Order.

7

Even considering as a whole the derisive treatment of Garcia following the escape of the female suspect as well as LaMaine's, Gonzalez's, and Radzimirski's antipathy towards Garcia, it does not constitute an overall work environment at TNT that could be characterized as "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21. Neither the targeting of Garcia for teasing, to the exclusion of Bobby Simpson, following the 2005 escape, nor Radzimirski's handling of the situation, however ill–advised, is shown to have been motivated by Garcia's race, because the detainee was indisputably Garcia's responsibility even though the means of her escape may have been the fault of another officer. Although Garcia expressed his belief that Radzimirski would not have acted so disparagingly if the officer on duty had been white, he has offered no comparative evidence to support an inference that Radzimirski or any other officers' conduct was racially discriminatory as opposed to unkind. Similarly, with respect to Garcia's claims that Lieutenant LaMaine "intimidated and bullied" him, the record contains nothing that points to treatment motivated by Garcia's race as opposed to personal animosity between the two.

Because the environment in the TNT unit has not been shown to be pervasively racially hostile, there is no basis to find a race–based constructive transfer, even if LaMaine and Radzimirski forced Garcia out of TNT by feeding Garcia's feelings of vulnerability.

III. Conclusion

For the reasons stated above, Officer Daniel Garcia's claims are dismissed.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 29th day of December, 2010.